## LOUIS JOY v. THE STATE.

### No. 48. Decided October 27, 1909.

**1.—Murder—Change of Venue—Bill of Exceptions.**

Where, upon appeal from a conviction of murder, the action of the court below in overruling a motion for a change of venue was not authenticated by a proper bill of exceptions, embodying the evidence on the motion, the same could not be considered.

**2.—Same—Evidence—Impeaching Witness.**

Where, upon trial for murder, the court rejected testimony with reference to the whereabouts of a certain pistol to impeach the statement of a State's witness, it appeared from the record that said State's witness made no remark or, statement with reference to this circumstance, and there was no predicate for impeaching testimony, there was no error; besides, the matter was not of sufficient gravity to authorize a reversal.

**3.—Same—Charge of Court—Murder in the First Degree.**

Where defendant was convicted of murder in the second degree, he cannot complain of the fact that the court charged the law of murder in the first degree, even if such charge was erroneous.

**4.—Same—Charge of Court—Accomplice.**

Where, upon trial for murder, the court's charge on accomplice's testimony operated to the advantage of the defendant, there was no reversible error, even where it was doubtful that such charge was technically correct.

**5.—Same—Charge of Court—Negligent Homicide—Harmless Error.**

Where, upon trial for murder, the court charged that no act done by accident is an offense, and that if the jury believed from the evidence that the defendant shot at deceased with the intention to frighten him, and thus accidentally killed him, with no intention to kill him, to acquit him, there was no reversible error in the court's failure to charge the law of negligent homicide, as the charge was more favorable to defendant than the law required.

**6.—Same—Charge of Court—Manslaughter.**

Where, upon trial for murder, there was evidence on the part of the defense that the defendant acted under the belief that some one was stealing his corn at night, and that he fired the shot to frighten the thief away, and the court instructed the jury on this phase of the case that, if the defendant killed the deceased under these circumstances, believing him to be the thief who was in the act of carrying away his corn, to acquit the defendant, even if such belief was erroneous, but did not arise from the want of proper care of defendant, and also, in addition, gave a full instruction on the general subject of manslaughter, there was no error in the court's failure to specifically apply the law of manslaughter to the above evidence.

**7.—Same—Sufficiency of the Evidence.**

Where, upon trial for murder, the evidence was sufficient to sustain a verdict of murder in the second degree, the same will not be disturbed.

Appeal from the District Court of Mason. Tried below before the Hon. Clarence Martin.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

The opinion states the case.

*Jenkins & McCartney* and *R. Runge,* for appellant.—Did the

charge given sufficiently cover this issue? The court gave the usual charge on manslaughter, which was calculated to confuse rather than elucidate this issue. The court did not charge upon this phase of the case at all. The court did charge that if appellant acted under such belief, and that the same did not arise from the want of proper care on the part of appellant, the jury should acquit the appellant. But if such mistake did arise from want of proper care, then what? The court nowhere informs the jury as to the law in such event. The court defined murder in the second degree, but nowhere informs the jury that the acts set forth in said charge as constituting murder in the second degree would not constitute such offense, if the defendant acted under a mistake of fact, which, if true, would have excused him, though such mistake arose from want of proper care on his part. Without such instruction, to tell the jury that such mistake would excuse the defendant, if there was no want of proper care, only intensifies the error in failing to charge the jury that such mistake would also excuse the defendant, so far as murder in the second degree is concerned, if such mistake did arise from want of proper care. The jury might well have found the existence of the facts constituting murder in the second degree, as set forth in the charge, the absence of mistake as to the facts. Looking to said charge they would have entirely discarded the issue of mistake, if they had found that such mistake arose from want of proper care on the part of appellant. Such is not the law, and we submit that a charge omitting this material issue, raised by the facts, and in effect charging the reverse of the law on such issue is not a pertinent and affirmative charge upon every material issue in the case. Bray v. Pendarvis, 41 Texas, 326; Neely v. State, 8 Texas Crim. App., 64. Upon the question of negligent homicide: Reddick v. State, 47 S. W. Rep., 995; Clifton v. State, 47 Texas Crim. Rep., 472, 84 S. W. Rep., 237; McConnell v. State, 13 Texas Crim. App., 390; McConnell v. State, 22 Texas Crim. App., 354; United States v. Boyd, 45 Fed. Rep., 851; Jones v. State, 95 S. W. Rep., 539.

*F. J. McCord,* Assistant Attorney-General, and *Dayton Moses,* District Attorney, for the State.—It is further contended that a failure to give this instruction was tantamount to instructing the jury that if there was an absence of want of proper care on the part of appellant he would be guilty, but did not state of what offense he would be guilty. This latter contention is not tenable for the reason that the charge nowhere states that if there was an absence of a want of proper care on the part of appellant he would be guilty; but on the contrary the charge as given presented that phase of the case solely as a matter of defense, and in each and every paragraph of the charge the court instructed the jury that if appellant killed the deceased under a mistaken belief that deceased

or any other person was stealing appellant's corn, and that such mistake did not arise from a want of proper care on the part of appellant that he would be guilty of no offense whatever. Nowhere in the charge, in presenting this phase of the law, does the court instruct the jury that the appellant would be guilty under any circumstances, and the question of "mistake of fact" was presented solely from a defensive standpoint.

RAMSEY, JUDGE.—This appeal is prosecuted from a judgment of conviction for the offense of murder in the second degree had in the District Court of Mason County, Texas, on March 11, of this year by which appellant suffered punishment at confinement in the penitentiary for a term of twenty-five years. There are a number of questions raised in the case, and in view of all the circumstances and many contradictions, and the peculiar character of the case, a rather fuller statement will be given than might ordinarily be deemed sufficient. The evidence showed that the deceased, C. M. Kyger, was a young married man, who lived in the town of Mason, where he was engaged as a clerk, and that he boarded at the Southern Hotel in that town. He left his father-in-law's ranch, about seven miles west of the town of Mason, about 8 o'clock on the night of his death, Sunday, December 13, 1908, to go to the town of Mason. He rode a horse belonging to his father-in-law. The road from where he started to the town of Mason led through a gate in a rock fence near the house of appellant. About 9 o'clock of the same night, the sheriff received information that appellant had shot a man near his house. He went there at once and interrogated him as to what had happened. Appellant's statement to the sheriff was in substance that someone was stealing his corn and that he ran off towards the gate and he shot him as he went over the gate; that he and Leslie Crouch were carrying some bedding out to the crib; that Crouch, who also had a gun, said, "There is one of the men now;" that he, appellant, grabbed his gun and took after him; that the man was standing at a tree at the northeast corner of his lot when he first saw him, about fifteen steps distant; that the man broke to run and he took after him and ran into a wagon tire, fell down, and that he hollowed to him about fifteen or eighteen times to halt, but he did not stop and he commenced shooting. He said the man had a sack of corn on his back. The sheriff examined the ground and found there was a sack of corn lying on the south side of the gate from three to five feet distant; there was the body of a man lying on the north side of the gate, head towards the southeast, on his right side, with his back to the gate, with a bullet hole through his head. This was the body of Kyger. He had on, as the sheriff testified, a very nice suit of clothing—coat and pants. The sheriff testified that he noticed horse tracks on the north side of the gate and it looked like the horse had wheeled and run off.

It was also shown by the testimony of this witness that from where the body was lying to appellant's crib was 350 feet; that the distance from where appellant claimed to have stood when he shot was 140 feet south of the gate; it was also shown that the sack with the corn in it was a tow sack; that he examined deceased's clothing and could find no evidence of a tow sack being carried by him and could find no corn silks or pieces of shucks on his clothing. On cross-examination it was shown that appellant stated that he did not know who it was he had shot; that he was going out to the barn with some bed clothing and was going to sleep in the crib that night to prevent anyone from stealing his corn; that he had had some corn stolen before this. Leslie Crouch, introduced by the State, testified that at the time of the homicide he was staying on the Greenwood farm in a house about 150 yards south of where appellant lived; that he and his wife, and his father and mother all lived together; that on the night of the killing he went over to appellant's after supper to get some fodder to feed his horse, and that one Henry Caveness went with him; that the fodder was in the lot adjoining appellant's crib on the south side; that at this time and place he saw two parties jump up and run away from the fodder stack; one of them was a tall slim fellow and the other was a low, heavy-set man; that when they went in the house they told appellant that they had seen two men at the crib and he asked what kind of shaped men they were, and that they told him, and he looked at his wife and said to her, "maybe that is the boys," and he then told her to fix up the bedding and he would sleep there; that the two got the bedding, etc., and started out, appellant having his gun with him; that after they got between the gate and the crib, the dog began barking and went out towards the gate north of the crib on the road towards Mason; that appellant threw his bedding down and followed up the road, and when he got up there he began shooting; that after the shooting appellant called him, and he went towards the gate where he was and asked him what he had done and appellant said he had played the devil, or something like that, and said that he did not give a dam, that he had no business fooling around; that he said he had shot somebody and for "me to go and tell my father, which I did," and then went into Mr. Joy's house; that appellant then had witness' father and Caveness to go and get the sheriff; that as they left appellant told him that he was into it, and into it bad, and that "I had to be dam sure that I swore to get him out of it." He told me that he wanted me to swear that I saw a man at the corner of his crib lot with a sack of corn on his back, and that when he hollered halt, that the fellow ran and that he hollered halt four or five times and ran after him before he began shooting. He said if I did not swear, I was in danger just like the other fellow." The testimony of this witness

was savagely attacked, and he admitted making many contradictory statements on the examining trial to those contained in his testimony on the final trial, stating he had given his testimony to the effect admitted, because appellant had told him to do so. These contradictions were both important and radical, but we deem it unnecessary to set them out here. Henry Caveness, introduced by the State, testified to somewhat the same facts; to his visit to appellant's house and seeing two men at the fodder stacks and the communication of this fact and to his and Leslie Crouch's going to the crib; that he heard the shots and went out on the gallery; that appellant called him and he went to where he was; that soon after this he started back to the house to put on his clothing, when he said appellant "told me to go down and get a sack of corn and get his little boy and bring the corn up there. I went to the house and got a sack of corn. He did not tell me what he wanted with it. I went into the lot and got the corn in a tow sack. I found the sack hanging in a live oak tree at the smokehouse. Defendant's son and I carried it up to Mr. Joy and he put it in the road. He said he put it there to protect himself." The testimony of this witness was seriously contradicted. He admits that he did not, at the examining trial, say anything about the sack of corn because as he says he was afraid that appellant would kill him if he ever got loose. William Crouch corroborates much of this testimony by the following statement: "He told Henry Caveness to go and get Pete and get some corn and put it by the gate. He said he shot a man and wanted to put the corn there by the gate to protect himself and for us to tell that the corn was there. He said it was for protection and we had to swear that it was there when we went out there." This witness, on cross-examination, admitted that in his evidence on the examining trial he had made no mention of this incident and explains that he had failed to mention it for the reason that appellant had told him not to. That he told them that they all had to swear that they had seen the corn there; that they all had to swear alike; that before this he knew that appellant had claimed that his corn was being stolen. Appellant's young son, Pete Joy, a lad who said he was going on eleven or thirteen years of age, was introduced, whose testimony tended to impeach strongly that of Mr. Crouch and the other witnesses. It was to the effect that Leslie Crouch had spread abroad untrue stories with reference to assaults on him by parties about his and appellant's premises. His testimony in respect to the incident of the killing is not important, or specially different from that of the other witnesses, except that he says that Leslie Crouch and Henry Caveness, on the night in question, had a pistol and that they took three cartridges out of it while sitting . by their fireplace. The testimony of this wit-

ness was seriously contradicted by showing directly contrary statements on the examining trial and that some of the statements made by Leslie Crouch he knew at the time to be untrue, as well as that some of the parties had lanterns and other wholly variant statements. He says on his cross-examination that he testified this way on the examining trial, because Leslie Crouch had told him to. He admits that the statement about the two men going to the Crouch house with lanterns was not true. There are a number of other contradictions in his testimony which are unnecessary to set out. Appellant showed by William Ellebracht that he remembered the circumstance of the homicide in question, and that before this appellant had told him that he might as well sell his corn as somebody was stealing it; that this was some three or four weeks before the killing. The testimony of Mrs. Joy is largely corroborated by that of appellant, which will hereafter be fully set out and was particularly positive as to Leslie Crouch and Henry Caveness having a pistol in her house and engaged at one time in taking some shells out of it. The testimony of appellant in his own behalf is as follows:

"Last fall from the time before I began gathering my corn up to the time I was put in jail I missed corn. Last September I was away from home one night cutting cane, and Henry Caveness told me that my boy shot at an owl and that he saw a man below the spring and that he shot at him. On Sunday before the killing I went to Blue Mountains to bring Mr. Crouch back. He had been up there picking cotton. We came back on Monday. I had my gun with me. When I got back Leslie Crouch told me that he went after somebody with an ax and they caught the ax and tore his clothes trying to cut him, and he showed me where his clothes were torn. I never knew that this was not true until I heard my son testify about it on the stand today. I believed that it was true. One night Leslie Crouch came to my house and said there was someone at my crib, and we could not find anyone and came back to the house and he said he saw someone sticking his head over the fence. I looked and told him that was a rock. He said, 'further up the fence.' On the evening of the killing I had been out with Mr. Will Crouch hunting. When I got back Henry Caveness was there. After supper I was writing a letter to Ed. Joy. Just as I finished it, Leslie Crouch came in and said there was someone down in the hollow between my house and his house, and that his pa said for him to come and tell me. We went down there and I took my gun. Henry Caveness got Mr. Crouch's. We went down the hollow and Henry Caveness said someone threw a rock and hit his foot. I didn't see anybody nor hear anybody. We went out to the crib. I went on one side and they went on the other. Directly I heard two shots. I heard Henry and Leslie running and I went to them. They turned back and met me. They said they

had seen two men between my fodder stack and my cane stack; that at first they went off on their all-fours, like hogs, and when they got off a little piece they ran and they shot at them. We went back to the house after awhile. Henry Caveness went to bed, and I started to the crib, me and Leslie Crouch, to sleep there. I had a cotton mattress and Leslie said, 'There is a man over there,' or 'What's that over there?' He said 'There he goes.' I took my gun and we both started. I ran into a cotton frame or an old buggy tire and fell. I got up and ran up to the road after him. Leslie's little dog was running up the road toward the gate barking. When we got up the road about half way we stopped. The little dog had stopped at some horses. Leslie said, 'They are going over the gate,' and we both commenced shooting. I think I shot two times and Leslie shot three times. We stood there for a few minutes and went up to the gate. I heard someone groaning and I walked up to near the gate and saw a man lying against the gate. I punched the gate with my gun and asked him what he was doing there. We looked over the gate and Leslie began crying and had a duck fit and said, 'It is papa,' and grabbed hold of me, having all kinds of fits. I shoved him loose as quick as I could, as I did not want to be hemmed up in that fix at that state of the game. We stood there a minute and I told him to go and get his papa. I called Henry Caveness and he came to me. When he came Leslie Crouch started to the house. We waited there until Mr. Crouch came. We heard Leslie call him. When Crouch came he had a six-shooter in his hand. He went up and said, 'Where is he at?' and asked what it was about, and what I was going to do about it. I told him I didn't know. Crouch said, 'You claim that you caught him stealing corn and we will swear you out,' and said, 'Let's get a sack of corn and put it there and we will swear you out.' Henry Caveness went to the house and got a sack and put on his clothes and brought the corn there and threw it down where it was when Mr. Gibbs came. Crouch asked me if I wanted the sheriff, and I told him we had better get him to come, and he said if I would stay with the folks he and Henry would go after the sheriff. They went to town after the sheriff and a doctor. I believed that at the time I shot that man had come to my crib to steal corn. I shot high when I shot, and I can safely say to my God and man that I am not the slayer of Melvin Kyger." On cross-examination, among other things, he says, "It was dark and I could not see. I thought a man was there and that I would give him a scare. I didn't reckon that he was there stealing corn. When old man Crouch came back that night he said, 'put a sack of corn there and we will swear you out.'" He further said: "And when Leslie saw a man lying by the gate he took a duck fit; he took hold of me; I shook him loose. I didn't want to be hampered at that stage of

the game. I didn't know but there was probably another party coming up to shoot at me. I was not wild and excited at that time. I think my brain was pretty good. I was reasoning on that right then. I kept my head cool. I knew everything that had taken place. I was capable of reflecting on the situation and knew everything that was taking place, and knew the danger I was in. Mr. Crouch said as he walked down to the house, 'you make a statement to the sheriff and we will swear you out;' that is all that he said at that time." Again he says: "I told the sheriff when he came that I saw a man standing at the corner of my lot with a sack of corn on his shoulder. That he ran and that I hollered halt eight or ten times and finally shot him. I fixed up this story myself to tell to the officer who arrested me." It is difficult to make a faithful synopsis of the testimony for the reason that in the testimony of almost every witness are errors, discrepencies and admissions of misstatements, but the above will probably be sufficient to make the opinion readily understood.

1. A reversal is sought, among other grounds, because of the action of the court in overruling the motion to change the venue from Mason County. This motion was based on the statutory ground that there existed so great a prejudice against appellant in Mason County that he could not obtain therein a fair and impartial trial. Proper affidavit was filed by appellant in which he was joined, as the statute requires, by the affidavits of two compurgators. This motion was resisted by the district attorney on the ground that one of the compurgators bore a bad reputation for truth and veracity and was not a credible person; that the information of the other compurgator was inaccurate and his source of information limited, and that in truth a jury of fair and impartial men could be readily obtained in the county before whom to try the case. The action of the court is not authenticated by any proper bill of exception, or are we advised on what evidence the court below acted in refusing the motion. In the absence of a clear showing sustaining the motion, and where the record does not preserve the evidence upon which the trial court acted, we must assume that his action was in accordance with the facts and correct under the law.

2. Again, vigorous complaint is made of the action of the court in excluding the testimony of Henry Ott and Blake Wooten, who would, it is stated, if permitted, have testified to facts tending strongly to show that there was a pistol in the house where William and Leslie Crouch lived, and that this fact was known to Leslie Crouch. This testimony, it is submitted, was material for the reason that Leslie Crouch had testified that he had no pistol and had had none for many months, and that if there was one on the place he did not know it. In approving this bill the court makes the following explanation: "That the witness William Crouch was per-

mitted to and did testify on the trial that at the time Kyger was killed there was a pistol at his house; that he had gotten said pistol from Blake Wooten the day before the killing, and that Leslie Crouch was with him (William Crouch) when he got the pistol from Blake Wooten, but that witness did not know of the said Leslie Crouch having the pistol at any time, and there was no denial by William Crouch that the pistol was at his house and that Leslie knew it was there." It should · be observed that in the bill it is not recited, or claimed that Leslie Crouch made any remark or statement whatever, and could not, therefore, be impeached by these circumstances. The witness William Crouch admitted, as the court states in his explanation, the substance of every fact, or at least the conclusion deducible from all the facts sought to be proved, that is to say, that he did get the pistol from Wooten, nor was there any denial by William Crouch that the pistol was at his · house, and that Leslie knew it. In view of these circumstances, it may well be doubted that the testimony was admissible in any event, and in view of the testimony of William Crouch, it is not believed to be of sufficient gravity or moment to warrant a reversal of the case.

3. Again, it is complained that the court erred in charging the law of murder in the first degree. We are not prepared to concede that this was error. It is elementary and so thoroughly settled as to require no citation of authorities that where a defendant is convicted of murder in the second degree, he can not complain of the fact that the court charged the law of murder in the first degree, or even of an erroneous charge in respect to such degree of murder.

4. Again, it is complained that the court erred in charging the jury as a matter of law that the witnesses, Leslie Crouch, Henry Caveness and William Crouch, were accomplices. We think it may well be doubted whether this charge was technically correct, but if erroneous, it was not of a character to injure appellant. If they were not accomplices, then, of course, their testimony stands before the jury as that of any other witness and would have been of a character not to require corroboration, as a matter of law, and sufficient within itself to have justified a conviction. When the court, however, as it did here, doubtless out of a spirit of caution, charged the jury that they were accomplices and required that their testimony should be corroborated before forming a basis of conviction, it certainly, if it had any effect, operated to the advantage of the appellant.

5. Again, counsel complain that the court erred in failing to charge the law of negligent homicide. It may, we think, well be doubted whether the court would have been justified, under the evidence, in giving such a charge. However, in view of the court's

charge, this objection can not avail appellant in any event. Among
other things, the court charged the jury as follows: "No act done
by an accident is an offense, and if you believe from the evidence
in the case that defendant shot at deceased with the intention to
frighten him and that he accidentally killed C. M. Kyger with no
intention at the time to kill him, then if you so find you will
acquit the defendant, and return a verdict of not guilty." Now,
it can not avail appellant that the court omitted to instruct the
jury that if the killing was accidental, but negligent, that they should
have convicted him of negligent homicide, when the court goes be-
yond this and in express terms charged the jury that if the killing
was accidental there is no degree of culpability, but the appellant
is entitled to go entirely acquitted. Of course, it is well settled
that the court should charge the jury upon every issue raised in
the testimony. It is also well settled that the court should charge
the jury in respect to the different degrees of homicide, even in-
cluding the law of negligent homicide, where such degrees are raised
by the testimony. As was said in the case of Burkhard v. State,
18 Texas Crim. App., 599: "The charge, to be sufficient, must
contain the law and all the law applicable to every issue legitimately
raised by the evidence." But it does not follow that where an issue
is charged upon and the instruction in respect to one of the lesser
grades of culpable homicide is more favorable than the law requires
it to be, that we should or will of necessity reverse the case. Broadly
speaking, under the evidence in this case, in order to entitle the
State to a conviction for negligent homicide, the jury would have
been required to find, first, that the shooting was accidental or
unintentional, and that it was under circumstances from which the
law would raise the imputation of negligence. If the jury should
believe that the shooting was accidental, but should further believe
that under all the circumstances appellant was free of culpable
negligence, then he could not be convicted of negligent homicide.
Now, in this case, the court gives him a more favorable charge in
submitting this issue than the appellant is entitled to receive. The
charge, in terms, instructs the jury that if they believe from the
evidence or have a reasonable doubt that appellant shot at deceased
with the intention to frighten him and accidentally killed him, he
could not be convicted at all. This charge, we think, presented
the matter in such way that appellant is wholly without just ground
of complaint, and while perhaps technically inaccurate, the charge
was of such a favorable character as not, in our judgment, to op-
erate a reversal of the judgment.

6. Complaint is made also that the charge of the court on the
subject of manslaughter was erroneous in this: That the court
should have instructed the jury that if at the time appellant shot
the deceased, if he did shoot him, he acted under the belief that the

deceased had, or was about to commit the offense of theft at night, and that he shot the deceased for the purpose of preventing such theft, or its consequences and for no other purpose or reason, that such killing would be of no higher degree than manslaughter, even though such killing occurred from negligence on the part of the defendant. The evidence clearly raised the issue of an honest belief on the part of the defendant as to such theft having been committed, or was about to be committed by the deceased at the time of the killing. On this issue the court charged the jury, among other things, as follows: "Homicide is permitted by law when inflicted for the purpose of preventing theft at night when the killing takes place under the following circumstances. It must reasonably appear by the acts or by words coupled with the acts of the person killed that it was the purpose and intent of such person to commit the offense of theft at night. In cases of theft by night the homicide is justifiable at any time while the offender is at the place where the theft is committed or is within reach of gun shot from such place. You are instructed that if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal he is guilty of no offense. The mistake as to fact which will excuse as explained above, must be such that the person so acting under a mistake, would have been excusable had his conjecture as to the fact been correct; and it must also be such mistake as does not arise from a want of proper care on the part of the person committing the offense. Now, bearing in mind the foregoing instructions if you find from the evidence that the defendant believed that the deceased or some other person was stealing his corn at night and he killed deceased while in reach of gun shot from the place where he believed his corn had been taken from or while deceased or some other person had possession of such corn, and that such belief on the part of defendant did not arise from want of proper care on the part of defendant and you are satisfied that under such conditions the defendant shot with a gun and thereby killed C. M. Kyger, then if you so find you will return a verdict of not guilty. And in connection with the foregoing paragraph of this charge you are instructed that it would make no difference whether deceased or any other person had in fact stolen defendant's corn, if you find that defendant believed such to be the case and you further find that such belief, if erroneous, did not arise from the want of proper care on the part of defendant to ascertain whether or not deceased or some other person had in fact stolen his corn and was trying to carry it away, at the time deceased was killed." In addition to this the court had given a full instruction on the subject of manslaughter which is not subject to any just complaint. We think the court's charge was sufficient and presented every issue pertinently arising in the case. Under

this charge, if the jury believed that the appellant had negligently killed deceased, believing him to be a thief, they could not have found him guilty of murder in the second degree, because the killing would have been without malice on his part, and because it is certain that under the definition of malice, it could not be contended that a person killing another whom he believed, without sufficient warrant, to be stealing and carrying away his corn at night, would be actuated by malice in doing so.

Finally, it is claimed that the evidence is insufficient to support the verdict. The case is, indeed, a singular one. There was no claim or contention made on the trial that the deceased, in fact, was at the time or had at any other time, been engaged in stealing appellant's corn. All the circumstances rebut the presumption that this was true. The testimony taken as a whole does sanction the belief that appellant believed that someone had been stealing his corn, and there is strong ground for believing that he thought so on the night in question. In view of his efforts to fabricate a defense, the remoteness of the body of the deceased from the crib, the fact that it was a public passageway, and other circumstances might well lead the jury to the conclusion that it was utter recklessness, if with no baser motive, that he fired upon and killed his unfortunate victim. All these matters were questions of fact, and, as stated, the record is full of contradictions and impeachments. Most of the witnesses admit making statements that were untrue for one reason and another, including appellant himself. The jury have found adversely to appellant, and the verdict having received the sanction of the learned trial court, we do not think that we can, or should, interfere. It is, therefore, ordered that the judgment of conviction be and the same is hereby in all things affirmed.

*Affirmed.*

[Rehearing denied December ——, 1909.—Reporter.]